**RUPRIGHT, Plaintiff-Appellee, v. BURNS, Defendant-Appellant.**

Ohio Appeals, Seventh District, Mahoning County.

No. 3182.   Decided October 31, 1947.

W. L. Countryman, Youngstown, for plaintiff-appellee.

Manchester, Bennett, Powers & Ullman, Youngstown, for defendant-appellant.

## OPINION

By PHILLIPS, J.

Defendant appeals on questions of law from a judgment of the court of common pleas entered upon a jury verdict for the plaintiff returned in her action against defendant to recover damages from him for personal injuries sustained, as she alleged, as the result of his "wanton misconduct" in the operation of his automobile, while riding as an invited guest and passenger therein; and claims that "the court erred in refusing to direct a verdict for defendant at the close of all the evidence", and "in refusing to grant judgment in favor of defendant notwithstanding the verdict of the jury".

At approximately 11:00 o'clock on the night of February 2, 1946, defendant, his sister, her escort and plaintiff left the Arena in downtown Cleveland in defendant's Buick automobile, which he was driving. The bill of exceptions discloses that enroute to Youngstown defendant slackened the speed

of his automobile at the numerous intersections and obeyed the various traffic lights for a distance of six miles in downtown Cleveland and suburban Shaker Heights; stopped approximately five minutes for gas, and "seven or eight or six" or "at least fifteen minutes anyway" for coffee, and "about three or four minutes" or "around ten minutes anyways" to converse with a traffic officer in Chagrin Falls, who plaintiff testified warned defendant to slacken his speed, and who defendant testified stopped him "to warn him that one of his dim driving lights was out"; that between 12:15 and 12:30 o'clock on the morning of February 3, 1946, when such automobile travelling east reached a point on U. S. Route 422, about 43.6 miles east of downtown Cleveland and 1.8 miles west of Southington, where such highway curves and in which there is a "series of dips", it collided with the rear of another automobile being driven "around 25 or 30 miles an hour" in the easterly direction over and along U. S. Route 422, as a result of which plaintiff was injured.

There is evidence that as defendant approached the scene of the collision an automobile headed in a westerly direction on U. S. Route 422 was laying in a ditch, and that two of the occupants thereof were standing in the middle of the highway, and to avoid striking them defendant, as he testified, "threw his car to the right" and elected to travel "in the right hand lane rather than run into the two men"; and as a result of that decision collided with the car to which reference has been made, which as far as the evidence discloses was under the control of the driver.

The evidence is decidedly conflicting and contradictory as to the speed at which defendant's automobile travelled from the time it left downtown Cleveland until it reached the place of collision, plaintiff's admonition to slacken it, and his attitude and general management of his automobile at all times plaintiff was a passenger therein, as well as the existence of an emergency at the time of collision.

There is evidence that prior to such collision plaintiff warned defendant concerning the speed of his car, which defendant and his witness denied, which was "leaping and swaying" over the road, and requested him to reduce the speed thereof, which was then "between 60 and 65" miles an hour, but that instead of complying with her request he increased it to 70 or 75 miles per hour.

Concerning what was beyond the brow of the hill he was approaching, the topography of the highway, what he saw, his reaction thereto, and what he did defendant testified as follows:—

"Q. Then the Purcell car went over the top of the hill did it, ahead of you?

"A. Yes.

"Q. And the tail lights disappeared for some little time?

"A. Not very long sir.

"Q. Just a short time? Just for a short time?

"A. Yes, because I was more or less driving behind them.

"Q. So that between the time of your last seeing of the tail lights, that car went over the hill and you getting to the top of the hill, you had no way of knowing what he was doing over there?

"A. No sir.

"Q. Nor did you have anyway of knowing what might be coming towards you?

"A. No sir."

At to whether defendant was suddenly confronted by an emergency, and if so who and what created it, and what he did he testified as follows:—

"Q. How far were you from the top of this last hill when the accident happened?

"A. Anywhere from a half to three-quarters of the way at the slope—down the slope.

"Q. When you reached the top of this hill and were passing over the top of the hill, was there any state of emergency there, or situation of emergency?

"A. No sir, there was a car driving ahead. I could see the tail lights of the car ahead of me half-way down the slant."

\*          \*          \*          \*          \*

"A. Well as the testimony given, there is a series of dips and I spotted this car ahead of me, it had its two tail lights on and was going up the slight grade. I was maybe a hundred or two hundred yards behind the car and it went over the dip and I came to the crest of the hill, and when I got to the top of the hill the tail lights of the other car were about half-way down this slope. I increased my speed, there was no cars coming towards me, it was an open road. I increased my speed as I would normally to pass him, and when I came up to pass him and I got six or seven car lengths behind him to pass, I eased my car to the left and at the same time the head lights of my car and the car ahead of me picked up these two men. Purcell's tail lights both showed red and he slowed down and the fellow stood in the middle of the left hand lane of the road. In a time like that, you think very quickly,

and I threw my car to the right, to get back of Purcell's car. To the left there was an embankment and on the left was the two men, and I figured to go in the right hand lane rather than run into the two men."

There is no evidence that defendant harbored any ill will toward plaintiff which is not necessary to constitute wanton negligence or misconduct, upon which latter plaintiff's case is grounded, which the supreme court has defined as follows:—

"To constitute wanton negligence it is not necessary that there should be ill-will toward the person injured, but an entire absence of care for the safety of others, which exhibits indifferent to consequences, establishes legal wantonness Such a mental attitude distinguishes wrongs caused by wanton negligence from torts arising from mere negligence." **The Higbee Co. v. Jackson, etc., 101 Oh St 75.**

"The term 'wanton negligence' implies the failure to exercise any care for the safety of those to whom a duty of care is owing when the wrongdoer has knowledge of the great probability of harm to such persons which the exercise of care might avert and exhibits a reckless disregard of consequences. (Paragraph three of the syllabus of **Higbee v. Jackson, 101 Oh St, 75,** approved.)" **Reserve Trucking Co. v. Fairchild, 128 Oh St 519.**

Subsequently the supreme court condemned the use of the words "wanton negligence", and in the case of **Universal Concrete Pipe Co. v. Bassett, 130 Oh St 567,** substituted the words "wanton misconduct" therefor, which it defines in that case as follows:—

"Wanton misconduct is such conduct as manifests a disposition to perversity, and it must be under such surrounding circumstances and existing conditions that the party doing the act or failing to act must be conscious, from his knowledge of such surrounding circumstances and existing conditions, that his conduct will in all common probability result in injury."

Concerning existing conditions the supreme court said in the case of **Vecchio v. Vecchio, 131 Oh St 59:**—

"The insecurely fastened door was an existing condition of which defendant must have had knowledge in order to fix liability upon her primarily, and with such knowledge she

must have known that the subsequent operation of the automobile would in all common probability result in injury to her guest, before recovery against her would be warranted."

Later in the case of **Jenkins v. Sharp, 140 Oh St 80,** ordered certified from this court, the supreme court approved and illustrated the rules announced in **Universal Concrete Pipe Co. v. Bassett, supra, Vecchio v. Vecchio, supra, Morrow v. Hume, Admx., 131 Oh St 319,** and **Akers v. Stirn, 136 Oh St 245,** and said:—

"Wantonness is essentially an attitude of mind and imparts to an act of misconduct a tortious character."

"In the case at bar the defendant's state of mind is disclosed by the circumstances that transpired before and at the time of the accident."

"Such a disposition or mental state is shown by a person, when, notwithstanding his conscious and timely knowledge of an approach to an unusual danger and of common probability of injury to others, he proceeds into the presence of the danger, with indifference to consequences and with absence of all care."

It is conceded by the respective parties that "wantonness can never be predicated upon speed alone", but it is the law of Ohio that:—

"* * * when the concomitant facts show an unusually dangerous situation and a consciousness on the part of the driver that his conduct will in common probability result in injury to another of whose dangerous position he is aware, and he drives on without any care whatever, and without slackening his speed, in utter heedlessness of the other person's jeopardy, speed plus such unusually dangerous surroundings and knowing disregard of another's safety may amount to wantonness." Morrow v. Hume, supra.

We are familiar with the law announced by the supreme court in the cases cited herein, and we have read carefully the bill of exceptions submitted to us in this case, and without further word or attempt to support our conclusion by citation of authority or reference to the evidence we are of opinion that there was insufficient evidence to go to a jury on the question of wanton misconduct of the defendant; and accordingly that the trial judge erred to defendant's prejudice

"in refusing to direct a verdict for the defendant at the close of all the evidence", and failing so to do "in refusing to grant judgment in favor of defendant notwithstanding the verdict of the jury"; and accordingly must and hereby do reverse the judgment of the trial judge and enter final judgment for defendant, as his counsel urges we should do.

The judgment of the court of common pleas is reversed, and final judgment is entered for the defendant.

CARTER, PJ, NICHOLS, J, concur in judgment.